The Honorable Judges of the United States Court of Appeals in and for the Seventh Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this Honorable Court are acknowledged to draw near and give their attention as the Court is now sitting. God save the United States and this Honorable Court. Good morning, everybody. We'll begin this morning with case number 16-3434, Antrim Pharmaceuticals, LLC v. BioPharm, Inc. We'll start with Mr. Dobie. Good morning, Your Honors. For the record, Gordon Dobie. This appeal involves a critical legal issue reviewable de novo. It's whether the trial court erred in failing to instruct the jury on the law surrounding the ownership of the principal matter in dispute. Antrim's position under federal law is the legal owner of an FDA-approved application to sell and market pharmaceutical products. Let me give you some background. The case involves Antrim Pharmaceuticals, which is a generic pharmaceutical company organized by one of the top pharmaceutical executives here in Chicago. It's a virtual company. And so Mr. Tamby, who organized the company, would pick products, work to obtain FDA approval. He was responsible for marketing and distributing the product. And then he would contract out with third parties to do manufacturing. In this case, BioPharm was the manufacturer. And in the trial, both sides agreed that that was the terms of the arrangement. There's some very specific things that we cite in the brief that were agreed to by both sides. But after the FDA approved Antrim's product, BioPharm essentially held the product hostage, refused to ship it, and we brought a claim for breach of contract because of their refusal to do so. The issue here, our position, is it's controlled by federal law. Federal law controls the question of who has the right to market and distribute a pharmaceutical product. And that right only arises after you file an application, you prove the safety and efficacy of your product. There's some information on your background as the owner. You have to deal with potential patent challenges, liability issues. There's a whole back-and-forth process between the owner and the FDA to obtain approval. Mr. Dobie, I know the judge did not give the jury instruction that you had proposed, and there were some issues with expert, which I know we're going to get to. But were you limited in any way from arguing factually what you're trying to propose now? So we, Judge Steeny, we were not arguing. The lawyers were allowed to argue their points factually, and that's obviously one of our complaints. So you were able to argue to the jury that as the ANDA owner, you also owned the underlying product. Both sides argued, made these points, and they actually put an expert on the stand to testify as to what the law was from their perspective. So rather than the judge instructing the jury on these points and the significance of this, whether you could have a secret interest in an ANDA that wasn't disclosed to the FDA, whether it could be held in trust, which was their position, and whether it could be transferred contractually. I don't think we've answered your question. Did we argue it factually, Judge Bauer? We argued it factually, right? And there were no limits factually what you could argue as to that point, were there? I know on the expert there were some restrictions and on the jury instruction, but the court, from what I could tell looking at the transcript, did not limit you factually in any way from arguing that. Is that fair? That's fair, Judge St. Eve, yes. So factually we were able to make that point. They were able to make their point factually. They were also allowed to have an expert testify on this. But this is, I mean, the bizarre thing about this trial, Judge St. Eve, is that that was the critical issue in dispute, was the ownership of this ANDA. We had jury instruction. Not the ownership of it, but the consequences of the ownership. Well, the consequences of it, they said that they owned it in trust, and a point in their 53-page brief that they never address, okay? And so let me just tell you, like, for example, the jury instruction, this is the best example. This is on BioPharm's counterclaim. BioPharm must prove each of the following propositions by a preponderance of the evidence. One, Antrim promised BioPharm that it would provide BioPharm with an ownership interest in escitalopram in exchange for manufacturing the product. Now, what does that mean by the ownership interest in escitalopram? That's a legal issue, and that issue was never presented by the court. That legal issue, whether or not you could hold an interest in trust, whether it could be just transferred contractually in secret without anyone knowing about it, and this comes back to the federal law that I'm talking about. So which you have argued in your proposed jury instruction number 8. Yes. You wanted the court to instruct that if you owned the ANDA, you owned the underlying product, essentially. I'm paraphrasing, but that's what you wanted the court to instruct the jury on as a matter of law. You have cited a number of federal regulations in your brief. Can you identify specifically which regulation provides that as a matter of law? So the best example is 3-1- No, wait, hold. She asked you can you cite. Yes, let me cite a regulation, Judge Bauer, if I can. So 21 CFR 314.72 specifically governs the issue of who is an owner of an ANDA, and if you're going to transfer it, it has to be disclosed. Okay, how does it govern who is the owner? It talks about a change in ownership of an application. It doesn't talk about who's the owner of the product. It's focused on the application and requirements and what you have to do with the FDA if you want to change the ownership of the application or the ANDA itself. Right. You're jumping to the product from that. Explain to us how you get to the product from the application itself. Yeah. Because that's not how I read it. Okay. So in this instance, Your Honor, there is product in the regulation. Antrim owns the product. That's the ANDA. That's the way if you own the product, you're the one that's responsible for the product's liability, filing reports every year. But where is it that says your premise there, that the ANDA is the product? I think it's throughout all of those regulations that we cite. They talk about the product and the ANDA. It's essentially one and the same throughout this. Then how do you get around Section 314.3 that says the ANDA holder is defined as the applicant that owns an approved ANDA? It doesn't say owns the approved ANDA and the underlying product. So let's break this down. In this instance, there is no, and this was the sophistry that we talked about in the brief, there's no underlying product other than the ANDA. There's nothing there. But ultimately there is. There's not. They define it. They're saying what the product is is the generic formulation of escitalopram, and that no one owns it. It's in the public domain. So when parties in the, and this is one of the things we wanted to have our expert testify to when he was blocked from talking about the ANDA. And that's a separate issue. Right. And so the issue as it relates to this is there is no, there is nothing other than the ANDA. And so when they talk about a product as being something separate, there simply isn't under these regulations. There's no, our client Antrim didn't have a physical product that it owned. They weren't asking for an ownership interest in our company. The only asset that our company even owned was the ANDA. So when they said we're not going to ship unless you give us ownership interest, and in some instances they said of the ANDA. In other instances they would say of the product. There is nothing to own other than the ANDA. But the issue before the trial was the contract for the ownership of the product. The issue. Not the ANDA. No. I know there were issues surrounding ANDA. Was it in a trust? But the main issue on the breach of contract was who owned the underlying Esitalopram. So our position, Your Honor, is that there was no, the issue on the trial was not who owns Esitalopram out in space. I mean, ownership comes with it. You have to own something. The only thing to own, the only thing that our client had was the ANDA. That's it. That's what we were fighting about. That's why they said, their sole fact witness said, we were holding it for a trust. In closing argument, they said the ANDA was held for it as a shared interest. Then why did you, if that's all that was at issue, why did you include proposed jury instruction number eight, the last line of which reads, if you find that Antrim was the owner of the ANDA for Esitalopram, then you must conclude that Antrim owned Esitalopram. So we included that, Judge St. Eve, because as the issue was rephrased by BioPharm, it was, in our judgment, it was an attempt to misstate what the federal law is here on this. I mean, that's the whole reason why we did this. And we didn't just file the jury instruction. We did three things. We filed a motion to eliminate, to prevent them from making this argument that there was anything there. We moved specifically to prevent their expert from being able to make this argument. And three, we provided the jury instruction. We did all three. And you proposed your own expert. We proposed our own expert to testify on custom and practice and how these terms would be understood. Absolutely. And why don't you develop on that. How does that differ from the expert Schwartz? So expert Schwartz was a lawyer, former FDA lawyer, and his sole job was to get up on the witness stand and testify without looking at a single document in the case, without looking at any evidence, to simply testify on the law. And so he got up on the witness stand, and he said specifically that the FDA could not carry a wit whether or not the ANDA was in Antrim's name, BioPharm's name, both of them, or whatever. Was he testifying about the law, Mr. Dobie, or was he testifying based on his experience, how the FDA handled this process? He testified specifically, this is what the FDA would infer. So he's talking about an agency motive, which is specifically what you're not supposed to do under cases that we cited, like the U.S. v. Caputo, the Bay Coal litigation, Reslin. Agencies, what's in their mind, what they think, and so on, is specifically not something for expert testimony. And BioPharm doesn't even respond to any of those cases in the brief, not a word. And they don't respond, when we talk about what the regulations provide, not one citation, either in their expert report or in their brief, about the law on these issues. The only thing they cite to – But back to the question I just asked. And you're right, he testified about what the FDA would infer. Yes. But I did not read his expert testimony as saying, this is what the law says. And I didn't read him saying it as, this is what this regulation stands for. It seemed more that he was testifying about, based on his experience with the FDA and an attorney at the FDA who had handled these, that when they received an ANDA application, this is what it meant to them. Yes, so he was in the legal department. He wasn't a reviewer. But he testified, essentially, that this is what the FDA would think, that it's perfectly fine. I mean, this is what he said. Contrary to the regulation 21 CFR 314.72, he essentially said it's perfectly fine to have a secret owner of an ANDA and that no one would care about that. I mean, we're talking about pharmaceutical products. Did he say that, though, about a secret owner of the ANDA? He didn't use secret. Wasn't his testimony about an owner of the product that was at issue in the ANDA? No. He said that you can contract and sell an ANDA without having a, without having, I think we quoted in a brief, without having approval. Yeah, I mean, I think it's state of mind is what he's testifying to. This is the agency's state of mind and would have been the state of mind as it related to these issues. And how does that differ from, because we've got to draw a line, how does that differ from Brynjolfsson, if that's how you pronounce his name? Yeah, so Mr. Brynjolfsson was, his testimony was on custom and practice in the industry. This is how things work. This is how these terms are understood. This is, he wasn't talking about the law at all. He's actually talking about his experience with ANDAs, contract manufacturers, and the like. I mean, to me, the idea that you'd exclude somebody who's done hundreds and hundreds of these type of contract arrangements and exclude his testimony on this but allow a lawyer to get up on the stand, the judge doesn't give any instruction at all on the legal issue and give his view of how things work at the FDA. Yeah, so Judge St. Ebeck, your question, this is on page 28 of our brief, and the record is A604-06. Is it your opinion that the FDA would only infer that Antrim is the applicant and BioPharm is the manufacturer from the ANDA application at issue? Correct. So the issues that he had to do with, they're talking about the ANDA. And the most significant thing, I think, from the briefs is, in fairness to the district court, I mean, what happened is – But my question was for the next question that was asked, that distinguishing between the product itself and the ANDA, not just the ANDA. I mean, he was testifying about the product too. Judge St. Ebeck, there's no product here. I mean, he mentions the ANDA, and in the prior sentence he uses the word product. I think it's my point, they're one and the same thing is the way the words were used, and it has to be the case here because we don't own anything other than this one ANDA. But that wasn't Mr. Schwartz's opinion, that they're one and the same. He wasn't giving an opinion about whether they're one and the same. His purpose was to testify that there was no significance, essentially no legal significance to the FDA by the virtue of the fact that Antrim – that the application was approved in the name of Antrim. Our point was that the fact that the parties agreed that Antrim would be the owner had all the significance in the world, and that the only issue in dispute for the jury to decide were the issues on the terms of the contract. You're into your rebuttal time. Did you want to reserve or do you want to continue? Yeah, I'll reserve. Thank you. Okay, thank you. Thank you, Mr. Doby. We'll hear now from Mr. Gekas. May it please the Court, Counsel, on this appeal Antrim is trying to reframe this case as a dispute about who owned the ANDA. It was not. This was a breach of contract case in which the primary dispute was whether there was a contract at all in the first place. Additionally, to prevail on its claim, Antrim had the burden of proving its own performance, causation, and damages by preponderance of the evidence. And as we set out in our brief, we believe that this appeal starts from the premise that all of those factual disputes were resolved in bioinforms failure because of the combination of the use of a general verdict form without an objection from Antrim and also by the failure to file a Rule 50 motion. And although in their reply brief Antrim says they're not arguing the evidence, I think respectfully there are multiple instances in which they are, the most salient of which is this focus on the alleged four material terms. There were more terms at issue and under negotiation. And indeed, for example, if you look at the trial docket, it's docket 213, pages 386, line 9 to 387, line 15, and page 388, 17, line 17 to 391.05, you will see that Mr. Tambi himself admitted on cross-examination that numerous terms were under negotiation. Likewise, my client testified in the transcript that's docket 215, page 751, line 15, to page 752, line 7, that there were numerous terms under negotiation. And the example he gave, the primary example he gave, was the lack of a quality agreement. And he is the head of quality at BioPharm, is known for saying he's somewhat of a disciplinarian. No quality agreement, no business agreement, no shipment. And so to Judge Steneve's questions about the difference between the ad and the product, there was a product here. There was physical acetalapram that was manufactured by my client that sat on their shelves and ultimately expired because the parties didn't reach to an agreement. And my client's position is that they were not obligated to sell the product that they made to Antrim without an agreement. And indeed, it was the refusal to sell that product to Antrim without an agreement that kicked off this case. If BioPharm's relationship with Antrim was not exclusive, why wouldn't BioPharm then attempt to sell the product to others prior to expiration? Because while BioPharm manufactured the acetalapram at its own expense, it didn't have the legal right, it didn't have the license to sell acetalapram without an approved ad. That's why. So they could have gone somewhere else. They could have tried to do it. They did not. But this case got into the dispute, especially early on. There was obviously hope that the case would settle. It did not.  But the other reason, too, Your Honor, is that this is a market that continues to degrade over time. And it's one of the reasons we believe that there are also no damages in the case. But those are the two main reasons. Do you have any case that would support that failure to file a Rule 50 motion would waive your right to challenge a jury instruction or the admission of expert testimony or exclusion of expert testimony? No, Your Honor.  If you start from the premise that there is no contract, then it means that all of the legal issues that were raised by Antrim are harmless error. There was no offer and acceptance. Indeed, there was no causation. As we outlined in our brief, there were no damages. And so if you start from the premise that Antrim failed to prove each of those three elements, arguably four elements, because I think in this case causation and Antrim performance kind of collapsed into one another in terms of the four elements that they were required to prove under Illinois law to prove a claim for breach of contract is a practical matter. It doesn't make any difference if the instruction was erroneous or if an expert was allowed to testify, but he shouldn't have. Wouldn't that really do away with the rule, though? It seems like you could make that argument. The winning party of a trial could make that argument about any issue raised on appeal. And that's not what the case law says on a Rule 50. I think it depends on the case, Judge. I admit I have not gone through the other possibilities where it might or might not. In this case, if there is no contract, if there is no causation, if there are no damages, then it simply doesn't matter. It's a theoretical point whether instruction number 8 should have been given either as is or as amended, whether Mr. Schwartz should have not been allowed to testify,  but if it's a legal issue and not a sufficiency of the evidence issue, which is what's raised with the jury instruction here, it seems like you're trying to get around the Rule 50B, sufficiency of the evidence requirement. I would argue that it's harmless, Judge. At most, it's harmless error. So if there are no further questions, I thank the Court and ask the jury to vote. I have a question about your expert and the expert testimony. So the Court permitted Mr. Schwartz to testify, and Mr. Schwartz testified about what the FDA would infer from an ANTA application and ownership issues. The Court would not allow and granted the motion and eliminate on relevance grounds to keep out the testimony of Antrim's expert, I'll mess up his name, but Mr. Brynjelsen. How do you distinguish the two? Because Mr. Brynjelsen's testimony and his custom and practice opinion was essentially that in other cases, parties typically structure the relationship here. He admitted, and give me just a moment, I have the site. He admitted that he did not know if Antrim and BioPharm had reached an agreement here, and that's from his deposition. I think Mr. Schwartz admitted that as well. He did. Mr. Schwartz's opinion was that the FDA would not make any inference one way or the other. In other words, Mr. Schwartz left it for the jury to decide whether an agreement was formed. And the reason for that, and the reason that was important evidence, was that the primary way that Antrim tried to use this argument about the ANTA and the product was the logical syllogism that we put out on page 25 of our brief that's reflected in instruction number 8, proposed instruction number 8. But the fallback was an evidentiary inference that they were trying to argue, that BioPharm made some kind of admission that by allowing Antrim to file the ANTA in its name, that conceded that my client did not have any contractual rights to some kind of equity arrangement in the venture of selling this product once it got there. And that was really what Mr. Schwartz was there to rebut, that it was not any kind of evidentiary admission from which the jury should draw an inference that BioPharm was conceding it didn't have any contractual rights to equity by merely filing the ANTA in Antrim's name. So that was the focus of that opinion, that part of Mr. Schwartz's opinion. He also testified on mitigation. Why wasn't Mr. Brynjolfsson's opinion, based on his years of practicing in the industry, not with the FDA but dealing in the industry and submitting ANTAs and working in this precise area, why wasn't his expert opinion there really to rebut Mr. Schwartz's? Well, I don't know that it was presented that way. I mean, Antrim, as the plaintiff, had the burden of proof to put on its case in chief. But as the factual premise of Mr. Brynjolfsson's opinion on cost of practice. But they also have a right to rebuttal. They do. They do. But I don't think he was presenting. For example, he wasn't called in rebuttal. But the factual premise of his opinion was that in other cases, it's typical that parties structure the relationship in that way. That's not relevant here in this case as to whether Antrim and BioPharm reached agreement. I mean, even if it's true, let's say I grant for the sake of argument, that in literally every other instance, every other contractual relationship between a manufacturer and an ANTA holder, it was set up the way that they said. That doesn't preclude my client from doing something different. But is that what his opinion was? Or was his opinion that based on his experience, the person who filed the ANTA is the one who owned the underlying product? Separate and apart from any contractual side contracts. Respectfully, Judge, I think they're one and the same. I think they were presented practically and legally as the same thing. I think that's a distinction without a difference. Anything more? No. Just ask for the affirmance of the jury's verdict, and thank you for your time. Thank you, Mr. Gekas. We'll move back to Mr. Dobie for his rebuttal time. So I want to start with where I ended last time, and some questions, Judge St. Eve, that you raised, again, about the product. We've now heard still another theory about what's the product that's even different from what their position was in the brief. And so I want to take a minute on this, because this has been a moving position. In their brief, this is at page 29, running over to page 30, they had one fact witness in this case, and the question was asked of him. This is Mr. Shaw. What is the product in this case, the question that you're asking? He says the product in this case is the generic formulation of escitalopram oral solution. Does Antrim own the generic formulation of escitalopram oral solution? No, Antrim does not own it. Who does own it? Nobody owns it. That was the position in their brief. That was the position that was in the trial. But remember this, what they told us is that they refused to ship because they weren't getting ownership. Well, they weren't not getting ownership of something that nobody owns. So now he's telling you, and this isn't even in their brief, that it's the physical product. That wasn't the position of the trial court. That wasn't the position even in their brief. That's point one. Point two, how did we get here with this? And in fairness to the trial court, when we filed this motion and we asked for the jury instructions, we asked for a motion to eliminate, BioPharm's counsel stood up and said, we're not asking for ownership of the ANDA. That has nothing to do with it. They were vociferous and said that's absolutely not the case. And then when the trial started, they took the position that Antrim was actually holding the ANDA for it in trust. Now they filed a 53-page brief. Nowhere in that brief, you can look through it again and again, are you going to find one statement with them explaining their position that it was being held for them in trust. So in closing argument, they said the ANDA was being held for it in a shared position. That's what they told the jury. So the record sites for both of those are A150 for held in trust. And in the closing argument, you'll see it at docket 215 at pages 298 through 99. And the contemporary in his documents show that they asked for the ANDA. And that's at A180. So after we got the approval, they wanted the ANDA. Okay, so yes, the term product is used, but the terms were used interchangeably. And that's how it's used in the regulation. You know, a company will say I own however many products and things. You're talking about the ownership of the ANDA. Okay, it wasn't physical product. That's not even the position that's in their brief. Finally, Justice Steve, you asked the question too about the general verdict form. You asked about a case. We cited Goodman v. Epstein that specifically provides that you can have a general verdict and so on. And don't forget this too. They didn't take an appeal of the denial of their counterclaim, but they sued us too. And the jury ruled in our favor in connection with their counterclaim. And so if you apply the law and try to decipher what happened here, it's our view that this case began and end with this issue about the ownership of the ANDA. And for that reason, the failure to instruct these issues that we raised about the experts, exclusion of ours, that they had their expert essentially testifying to the agency's intent and motive, we would respectfully ask that the case be reversed and remanded. Mr. Dobie, one more quick question, please. On jury instruction eight, when the court rejected it, it invited you if you wanted to submit an alternative at the final pretrial conference that you could. I couldn't tell if you submitted an alternative to jury instruction eight at any point. Did you? So we did not submit an alternative instruction. There was no dialogue with the court. He rejected it out of hand. I did re-raise it before instruction conference that we'd asked that the court do that, but we didn't do a new one. Thank you. Thank you. Thank you, Mr. Dobie. Thank you. The case will be taken under advisement.